IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:98-00038 |
| | ) | Judge Nixon |
| DONNELL YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

Pending before the Court is Defendant Donnell Young's First Motion to Suppress or

Exclude Eyewitness Identification ("Defendant's Motion") (Doc. No. 2100).  The parties have

filed numerous pleadings on the subject of Defendant's Motion, the Court issued an Order (Doc.

No. 2141) that was reversed and remanded by the Sixth Circuit on interlocutory appeal, United

States v. Young, 533 F.3d 453 (6th Cir. 2008), and an evidentiary hearing was held in this Court

on remand.  The relevant procedural history is detailed fully below.  For the reasons discussed in

this Memorandum Order, Defendant's Motion is **DENIED**.


## I.      PROCEDURAL BACKGROUND

Defendant was indicted for one count of drug conspiracy on November 20, 1998.  (Doc.

No. 164).  Defendant was later indicted on federal murder charges on September 30, 1999.  (Doc.

No. 634).  Trial in this case was continued on a number of occasions, as detailed in this Court's

Order and Memorandum finding no violation of Defendant's Sixth Amendment right to a speedy trial. (Doc. No. 2119). Voir dire commenced on October 24, 2005. (Doc. No. 2057).

On October 31, 2005, Plaintiff Government ("Government") sent Defendant a list of 19 additional witnesses to be called by the Government at trial. Defendant subsequently filed a Motion to Exclude Evidence of Uncharged Heretofore Undisclosed Alleged Acts of Misconduct; Alternative Motion to Adjourn Jury Selection so the Court Can Hear Evidence Regarding the Heretofore Undisclosed Acts of Violence and if Necessary Allow the Defense to Seek Appropriate Relief (Doc. No. 2074) on November 4, 2005. At that point, Defendant had incomplete information as to the identity and prospective testimony of the 19 witnesses. The Government filed a Response in Opposition (Doc. No. 2076) the following day, November 5, 2005. This Court scheduled a hearing on the matter on November 10, 2005. (Doc. Nos. 2088, 2098).

On November 17, 2005, Defendant filed a First Motion to Suppress or Exclude Eyewitness Identification ("Defendant's Motion") (Doc. No. 2100). Defendant's Motion reflected Defendant's newly acquired knowledge as to the identity of one (1) of the 19 witnesses, Mary "Rochelle" Walker ("Ms. Walker"), and her prospective testimony – that she alleged having seen Defendant leaving the scene of the murder for which Defendant is charged. Defendant's Motion argued that Ms. Walker's testimony and evidence of her alleged identification should be suppressed because Ms. Walker's identification was unreliable and was obtained through police misconduct. The Government filed a Response in Opposition on November 29, 2005. (Doc. No. 2104), and Defendant filed a further Reply on December 7, 2007 (Doc. No. 2114).

-2-

On January 6, 2006, the Court held sua sponte that the Government's October 31, 2005 notice of 19 additional witnesses was in violation of 18 U.S.C. § 3432, and that all witnesses and associated evidence was to be excluded. (Doc. No. 2141). The Government filed a Motion for Clarification and Reconsideration of Order (R. 2141) Precluding Evidence (Doc. No. 2149) on January 11, 2006, to which Defendant filed a Response in Opposition (Doc. No. 2152) on January 13, 2006. The Government filed a Reply on January 16, 2006 (Doc. No. 2153), to which Defendant filed a Response on January 19, 2006 (Doc. No. 2157). The Government filed two (2) additional pleadings on this matter on January 26 and 27, 2006 (Doc. Nos. 2161, 2164) and Defendant filed one additional pleading on January 27, 2006 (Doc. No. 2162). The Court addressed the request for clarification and reconsideration by written Order on January 27, 2006 (Doc. No. 2169), refusing to reconsider its exclusion of evidence pertaining to the late-noticed 19 witnesses.

The Government filed for interlocutory appeal of the Court's decision excluding evidence pertaining to the 19 witnesses on March 6, 2006. (Doc. No. 2237). The Sixth Circuit reached an opinion reversing and remanding on July 18, 2008. (Doc. No. 2008). In response to the remand Order, Defendant filed a Motion to Exclude Testimony of M.W. Due to Prejudice Due to the Government's Dilatory Investigation (Doc. No. 3312) on August 8, 2008. The Government filed a Response in Opposition on August 21, 2008 (Doc. No. 2008), to which Defendant filed a Reply (Doc. No. 3329) on August 28, 2008. A hearing was held on the matter on October 16, 2008, and was continued on November 25, 2008. Subsequent to the hearing, Defendant filed a Brief (Doc. No. 3418) on December 2, 2008, summarizing Defendant's position with respect to Ms. Walker's testimony.

-3-

## II.    FACTUAL BACKGROUND[1]

This case arises out of a seven-year federal investigation of the Los Angeles Rollin' 90s Crips. The investigation yielded federal indictments against 25 co-defendants, many of whose cases are now closed. Defendant in this case, Donnell Young, is charged with drugs and weapons offenses, as well as three (3) counts pertaining to the death of Woody Pilcher ("Mr. Pilcher"). The Government seeks the death penalty.

### 1.    Ms. Walker's Account of the Morning of the Pilcher Murder

Mr. Pilcher was killed on August 2, 1997, in Oklahoma City. At the time, Ms. Walker was living with two (2) women, Diane Jenkins ("Ms. Jenkins") and Pareda James ("Ms. James"), as well as her late husband, Walter Walker ("Mr. Walker"), in an apartment adjacent to the apartment in which Mr. Pilcher was killed. According to Ms. Walker, her experience on August 2, 1997, the day of the Pilcher killing, was as follows: early in the morning, Ms. Walker walked to a nearby store with Ms. Jenkins where the two (2) women purchased 40 ounce bottles of beer, which they drank. At the October 16, 2008 evidentiary hearing held in this Court, Ms. Walker testified for the first time that she saw the Defendant that morning in the store.[2] She said that he was wearing a distinctive, brightly-striped shirt, khaki "Dickies" brand pants, and wire-rimmed glasses.

Upon returning to her apartment thereafter, Ms. Walker looked out her window and saw

---

[1]   All facts in this section are taken from the Parties' extensive pleadings of the parties, as well as the evidentiary hearings held in this Court. Facts are undisputed unless otherwise noted.

[2]   Throughout her testimony and discussions with law enforcement, Ms. Walker referenced members of the Rollin' 90s Crips whom she knew by "street names" or nicknames. She did not know the given names of these individuals.

-4-

Wallace Davis ("Mr. Davis") wiping off an automobile from her apartment window. At the October 16, 2008 hearing held in this Court, Ms. Walker added for the first time that two (2) young men, matching the descriptions of Cornelius Humphrey and Coy Baird, were also present in the driveway below. When questioned on cross-examination as to why she had not included this detail in earlier statements to the Government, Ms. Walker responded that she gave no more information to the Government than was explicitly elicited.

According to Ms. Walker's testimony at the October 16, 2008 hearing, Ms. Walker called down to Mr. Davis who then approached her and asked who else was at home. Ms. Walker responded that she was alone, and Mr. Davis gave her $20 with which to buy him a pack of Newport cigarettes from the store. As Ms. Walker was leaving her apartment, she saw her husband, Mr. Walker, approaching in his van. Mr. Walker then drove Ms. Walker to a different store than she had been to earlier in the morning.

On their way home from the store, Mr. and Ms. Walker were stopped at a red light just before turning onto their street when they heard gunshots coming from the direction of their home. As they drove toward their apartment, Ms. Walker saw the same two (2) young men she claimed to have seen earlier that day in the driveway walking towards her. On the opposite side of the street, walking in the opposite direction of the two (2) young men, Ms. Walker saw Defendant, whom she recognized first by the distinctive striped shirt he had been wearing earlier. Ms. Walker stated that Ms. Jenkins was standing outside their apartment screaming "he's dead, he's dead" and that Defendant turned around to look in the direction of the screaming. Ms. Walker stated that she was then able to recognize Defendant by his face and glasses when he turned to look over his shoulder. Later that same day, Ms. Walker saw Defendant a third time in

-5-

the store she had seen him in earlier in the day. Defendant was still wearing the distinctive striped shirt; he waived to Ms. Walker and asked her if she had seen Mr. Davis. Ms. Walker told him that she had not. Defendant then asked whether Ms. Walker had seen anyone, and she again replied in the negative.

2. Ms. Walker's Familiarity with Defendant

Ms. Walker and Defendant were not strangers at the time of the Pilcher killing. For approximately a year and half between 1995 and 1996, Ms. Walker cleaned an apartment at which Defendant and others allegedly sold narcotics. According to Ms. Walker, Pacia Shakir was primarily responsible for the drug trade at that location, but Defendant was in charge in Pacia Shakir's absence. Ms. Walker cleaned the apartment in exchange for crack cocaine, and came into contact with Defendant frequently. She would sometimes hang out in the apartment while Defendant was there and answer the door for him. Defendant allowed her to keep any money or narcotics she found on the floor while cleaning. Ms. Walker described herself and Defendant as acquaintances who had engaged in short conversation on numerous occasions.

3. The Government Discovery of Ms. Walker and Her Alleged Identification

According to Ms. Walker's October 16 2008 hearing testimony, as soon as Mr. and Ms. Walker arrived at their apartment on August 2, 1997, moments after hearing gunshots from their van, Mr. Walker dialed 9-1-1. In his subsequent account of events to Oklahoma City Police, Mr. Walker did not mention that his wife, Ms. Walker, had been with him, nor did he mention seeing Defendant walk away from the crime scene. Ms. Walker waited in the van while Mr. Walker spoke with police. Mr. Walker was later interviewed a second time, and he again failed to mention either his wife or any observation of Defendant on the day of the Pilcher murder. Ms.

-6-

Walker testified that her husband did not mention her presence for the reason that Ms. Walker had outstanding warrants at the time, and was using crack cocaine, and did not want to be discovered by the police.

Oklahoma City Police conducted bystander-interviews on the day of Pilcher's murder in the course of their investigation. Ms. Walker was never interviewed. Ms. Jenkins is the only person who referenced Ms. Walker in the course of her bystander-interview: she told Oklahoma City Police that Mr. Walker had been with a woman named "Rochelle" on the morning that Mr. Pilcher was shot. Ms. Walker was commonly know to Ms. Jenkins and others as "Rochelle" at that time.

In the course of the federal investigation associated with the indictments against Defendant and his co-defendants, the Government did not follow up on the bystander-interviews conducted by the Oklahoma City Police Department. This case proceeded to trial. On October 9, 2005, the Government provided Defendant with the names and addresses of 151 potential trial witnesses. Federal Prosecutors then traveled with Los Angeles Detective George Leiker ("Detective Leiker") to Oklahoma City to serve subpoenas and conduct final interviews in preparation for trial. In the course of these interviews, bystander Mary Judy said that someone named "Rosalyn" claimed to have seen the shooter leave the scene of the Pilcher murder. On October 18, 2008, Ms. Jenkins told the Government that "Rochelle" had seen the killer leaving the crime scene, and that "Rochelle" saw married to Mr. Walker. The next day, Ms. Jenkins identified Ms. Walker as "Rochelle" from a photograph.

The Government located Ms. Walker on October 30, 2008 and conducted an interview in an unmarked police car; Ms. Walker was interviewed by Detective Leiker and two (2) Federal

-7-

Prosecutors. Ms. Walker expressed trepidation at being seen with police. The meeting lasted between 45 minutes and one (1) hour – Detective Leiker testified to feeling constrained for time, both because Ms. Walker was uncomfortable and because Detective Leiker and the Prosecutors had a flight to catch the same day. It was not possible for the Government to interview Mr. Walker at this time, as Mr. Walker died on July 29, 2005.

Early in the interview, the Government produced two (2) "16-packs" to show Ms. Walker. Detective Leiker testified that 16-packs are single sheets of paper containing photographs of 16 individuals. Whereas 6-packs contain the photographs of six (6) individuals who look alike and are commonly used to insure that an eyewitness identification is reliable, 16-packs generally contain photographs of gang members and are used in-house as a reference by law enforcement. According to the testimony of Detective Leiker and Ms. Walker, Ms. Walker was handed two (2) 16-packs containing a total of 30 photographs and asked if she recognized anyone.[3] Ms. Walker identified five (5) individuals, including Defendant.

It is unclear when the Government first asked Ms. Walker to describe her experiences on the day of the Pilcher murder. The interview with Ms. Walker was not recorded nor fully transcribed. The only memorialization of the interview is in Detective Leiker's summary notes. Detective Leiker testified that there may have been some discussion of Ms. Walker's alleged identification prior to the Government display of the 16-packs. However, Detective Leiker testified that he was certain that the majority of the discussion surrounding Ms. Walker's alleged identification occurred thereafter. According to Detective Leiker, it was after identifying Defendant and four (4) others that Ms. Walker described seeing Defendant leaving the scene of

---

[3] One of the 16-packs was technically a "14-pack" as it contained only 14 photographs.

-8-

the Pilcher murder, including descriptions of his shirt and glasses.

On October 31, 2006, the Government provided notice to Defendant that Ms. Walker was a potential Government witness. Simultaneously, the Government provided Defendant with notice of 18 other potential witnesses. The testimony of these witnesses concerns an alleged assault on Troy Rogers, and is outside the scope of this Order.

Ms. Walker testified before this Court that she did not seek out police to give her account of the day of Pilcher's murder because there were outstanding warrants against her in 1997, because she was using crack cocaine until approximately 2005, and and because she was generally reluctant to assist law enforcement in a murder prosecution.


## III. ANALYSIS

### (i) Section 3432

Section 3432 states in pertinent part that, "[a] person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of . . . a list of . . . the witnesses to be produced on the trial for proving the indictment . . . ." 18 U.S.C. § 3432. By Order entered January 6, 2006, this Court held that trial begins for purposes of § 3432 with the beginning of jury selection, making the Government's notice to Defendant of witness Mary Walker 10 days late. (Doc. No. 2141). The Court subsequently excluded Mary Walker's testimony as inadmissible in violation of § 3432.

On interlocutory appeal of the Court's January 6, 2006 Order (Doc. No. 2141), the Sixth Circuit reversed and remanded. United States v. Young, 533 F.3d 453 (6th Cir. 2008). The Appellate Court upheld that portion of this Court's Order that found the Government in violation

of § 3432. However, the Court of Appeals rejected this Court's automatic exclusion of Mary Walker's testimony, stating that this Court failed to balance § 3432's purpose in preventing trial by surprise with the public's interest in the truth-seeking function of courts. Id. at 462. Finding little analysis of § 3432 in the history of appellate decisions, the Sixth Circuit relied largely on United States v. Fulks, 454 F.3d 410, 422 (4th Cir. 2006), in crafting a rule to determine the following remedy for violation of § 3432: courts must balance "(1) the government's good faith, (2) the government's diligence in pretrial investigations, and (3) any prejudice to the defendant caused by unfair surprise that could not be cured by brief adjournment." Id. at 462-63 (internal citations omitted). Exclusion is proper only if these three (3) factors so suggest under the totality of the circumstances. Id.

This Court's judgment was vacated and the case remanded for decision under the standard explicated by the Sixth Circuit.

### 1. The Government's Goodwill

The Government's goodwill in this case has never been seriously contested, there is no evidence to undermine the Government's goodwill, and the Sixth Circuit has already held that the Government acted in good faith. Young, 533 F.3d at 466. The Government's goodwill thus weighs against exclusion of Ms. Walker's testimony.

### 2. The Government's Diligence

#### A. Whether the Sixth Circuit Has Spoken to the Issue

The parties dispute whether or not the Government's diligence in this case was decided by the Sixth Circuit's interlocutory decision. This Court permitted testimony regarding the Government's diligence at the evidentiary hearings held on Defendant's Motion for the reasons

-10-

discussed below.

The portion of the Sixth Circuit's opinion suggesting that the Government's diligence was decided on appeal is contained in the following excerpt:

> [a]lthough the government acted in good faith and conducted a reasonably diligent investigation, exclusion would be proper upon a showing of irreparable prejudice by Young. Because the district court never reached this issue, and because it is in the best position to consider this claim in the first instance, we remand for consideration of whether Young can establish that these late additions will irreparably harm his defense.

Young, 533 F.3d at 466 (internal citations omitted). This excerpt would seem to state unequivocally that the Government was reasonably diligent in its discovery of Ms. Walker and her prospective testimony, and that remand was for the limited purpose of determining prejudice.

However, the excerpt above does not distinguish between the two (2) types of evidence that this Court excluded in its earlier Order (Doc. No. 2141): (1) Ms. Walker's testimony, and (2) 18 witnesses to the alleged assault on Troy Rogers. In the only section of the opinion that discusses the Government's diligence with respect to Ms. Walker, the Court of Appeals stated:

> [e]valuation of the government's diligence as to naming her outside the three-day deadline should have looked to whether the government's reliance on police reports of bystander-interviews rather than face-to-face interviews was reasonable given (1) the considerable distance between Oklahoma City and Nashville (the trial venue), and (2) the expected minor role of these witnesses . . . . The district court did not explain how the government's efforts to discover Mary Walker fell short, especially given that Walter Walker (though twice interviewed by the police) never mentioned Mary Walker's presence, no other bystander mentioned her presence, and only when the prosecution traveled to Oklahoma City did two bystanders reveal the new information that the government then pursued to locate Mary days later.

Id. at 464-65 (internal citations omitted). The Court finds the language in this excerpt ambiguous

-11-

with respect to whether or not a conclusion was reached by the Court of Appeals regarding the Government's diligence in discovering Ms. Walker. Although the Sixth Circuit stated what this Court should have done and highlighted facts that should have informed this Court's analysis, the appellate decision ends without an identifiable statement that the Sixth Circuit found diligence in the Government's discovery of Ms. Walker. In this light, it is unclear whether the Court of Appeals was merely directing this Court on remand, or explaining its own decision. This ambiguity undermines the clarity of the Sixth Circuit's later statement that "the government acted in good faith and conducted a reasonably diligent investigation:" was that statement meant to assert a conclusion as to the Government's diligence in discovering Ms. Walker two (2) pages after analysis of that subject, or was the Sixth Circuit instead speaking in categorical terms while intending to reference only the Government's diligence in locating the witnesses to the alleged assault on Troy Rogers? Id. at 466.

Against the backdrop of this Court's confusion as to the precise intention of the Sixth Circuit, the Court finds that two (2) considerations suggest that this Court should make a diligence finding on remand. It was in light of these two (2) considerations that the Court permitted testimony on the topic at the evidentiary hearings on Defendant's Motion.

First, the Sixth Circuit noted in its decision that the district court "is in the best position . . . in the first instance" to consider any claim of prejudice resulting from violation of § 3432. Id. at 466. This Court sees no reason to distinguish a claim of prejudice from one for lack of diligence – both concern analysis of facts – and thus no reason why a district court is not also the proper body to determine the Government's diligence in the first instance. See Ohio Republican Party v. Brunner, 543 F.3d 357, 362 (6th Cir. 2008) ("factually-intensive issues are best presented, in

-12-

the first instance, to the district court"); see Winterhalter v. Watson Wyatt & Co., 87 Fed. Appx. 513, 519 (6th Cir. 2004) (whether late discovery of evidence was due to lack of diligence is a question of fact); see also Greene v. Michigan Dept. of Corrections, 315 F.2d 546, 546 (6th Cir. 1963) (diligence determinations are questions of fact).

Second, the Court of Appeals did not consider all of the facts relevant to a determination of diligence. The Sixth Circuit stated that, in the course of Oklahoma City bystander-interviews subsequent to the Pilcher murder, "no other bystander mentioned . . . [Ms. Walker's] presence." Id. at 464-65. As a formal matter, this is arguably correct – no bystander used the name "Mary Walker." However, Ms. Jenkins told Oklahoma City Police in 1997 that "Rochelle" was with Walter Walker – the man who called 9-1-1 – on the day of the Pilcher murder. Ms. Jenkins was the same bystander who later provided the information leading to the Government's discovery of Ms. Walker in 2005, when she again referred to Ms. Walker as "Rochelle." This information – that the Government's 2005 discovery of Ms. Walker was from the same source who identified Ms. Walker in 1997 using the same name she would later use in 2005 – is at least probative to a determination of the Government's diligence.

These two (2) considerations – (1) that this Court is the proper trier of issues of fact in the first instance, and (2) that the Sixth Circuit's decision does not reference all relevant facts with respect to the Government's diligence in discovering Ms. Walker – persuade this Court that the question of the Government's diligence is properly before it.

B. <em>The Government's Diligence</em>

Whether or not the Sixth Circuit intended its decision to represent a finding that the Government's discovery of Ms. Walker was the result of reasonably diligent investigation, the

-13-

Appeals Court directed this Court to consider a number of factors that weigh in favor of the Government's diligence:

> (1) the reasonableness of the Government's reliance on Oklahoma City police bystander-interviews instead of conducting its own face-to-face interviews in light of:
>
> > (A) the distance between Nashville (the trial venue) and Oklahoma City
> >
> > (B) the perceived relatively minor evidentiary value of bystander testimony, namely, to corroborate the testimony of eyewitnesses Coy Baird and Cornelius Humphreys
>
> (2) the fact that Walter Walker did not mention his wife, Ms. Walker, in either of two (2) interviews conducted by the Oklahoma City police.

Young, 533 F.3d at 464-65. The Court notes that these considerations provide strong support for a finding of reasonable diligence by the Government.

As noted above, however, relevant to a determination of diligence is whether or not the Government's ultimate discovery of Ms. Walker and her potential testimony was on the basis of new information in 2005, or whether the Government should have known of Ms. Walker's potential testimony as early as 1997. Here, the Court considers significant that Diane Jenkins told police in 1997 that a woman named "Rochelle" was with Walter Walker on the day of the Pilcher murder. Diane Jenkins was the source that led the Government to Ms. Walker in 2005, when she referred to Ms. Walker by the name "Rochelle," just as she had in 1997.

Critically, however, Ms. Jenkins provided two (2) important details to the Government in 2005 that were not given to the Oklahoma City police in 1997: (1) that "Rochelle" was Mr. Walker's wife, and (2) that "Rochelle" told Ms. Jenkins that she had seen Defendant leaving the

-14-

scene of the Pilcher murder. This new information provided the Government a springboard for discovery of both Ms. Walker's identity and her prospective testimony. On the basis of this information, reasonable investigative practices clearly required the Government to follow-up as it did.

The question for present purposes is whether the Government was similarly required to investigate Ms. Walker's identity and testimony on the basis of the more limited information at the Government's disposal in 1997. This Court must consider, as directed by the Sixth Circuit, that the Government behaved reasonably in relying on the Oklahoma City police department's bystander interviews in 1997. As a result, this Court may not conclude that the Government should have been in possession of more information in 1997 from which to locate Ms. Walker and discover her potential testimony. The Court may thus find that the Government's investigation was not reasonably diligent only if it determines that the Government was required to follow up on the lead noted above: Ms. Jenkins' statement to Oklahoma City Police in 1997 that Mr. Walker was accompanied by "Rochelle" on the day of Pilcher's killing.

On the basis of this more limited information, the Government did have reason to believe that Walter Walker, the man who dialed 9-1-1, was accompanied by a woman at the crime scene who was never interviewed. Furthermore, because Mr. Walker dialed 9-1-1, it would have been reasonable to assume that "Rochelle" was a bystander with some information to impart. However, the following factors suggest that, nonetheless, reasonable diligence did not require the Government to follow-up on this initial lead.

First, Mr. Walker made no mention of Ms. Walker or "Rochelle" in two (2) interviews. The Government may reasonably have inferred from that fact that either (1) Mr. Walker was not,

-15-

in fact, accompanied by anyone, contrary to Ms. Jenkins' statement, or (2) that Mr. Walker's bystander account was comprehensive, and that Mr. Walker believed that no one in his presence could offer any additional testimony of which he was aware. Mr. Walker's alleged motivation – to shield Ms. Walker from police notice in light of her outstanding warrants – is not a fact the Government could have been expected to know.

Second, and perhaps more importantly, the Government had no way of knowing in 1997 that Ms. Walker could testify to having seen the Defendant leaving the crime scene. In 1997, it would have been reasonable to assume that whoever "Rochelle" turned out to be, could only offer evidence of the kind which the government already had in abundance: background information to corroborate Cornelius Humphrey and Coy Baird's eyewitness testimony. The Sixth Circuit has already held on appeal of this matter that the Government had little reason to pursue such a witness. <u>Young</u>, 533 F.3d at 464-65.

For these reasons, the Court finds that the Government was not obligated to investigate the identity and prospective testimony of Ms. Walker on the basis of the information at its disposal in 1997. Accordingly, the Government's subsequent discovery of Ms. Walker and her testimony in 2005 on the basis of new and significantly more pointed information was reasonably diligent. This finding of Government diligence weighs against exclusion of Ms. Walker's testimony despite the Government's violation of § 3432.

### 3. Prejudice

While the Government's good faith and reasonable diligence have been established, the Court must nonetheless exclude Ms. Walker's testimony if Defendant can show that the late notice of Government witness Ms. Walker would result in irreparable prejudice were Ms. Walker

permitted to testify at trial. <u>Young</u>, 533 F.3d at 466. Defendant suggests irreparable prejudice under two (2) different theories. The Court considers each in turn.

### A.     The Death of Walter Walker

Walter Walker died on July 29, 2005. According to Defendant, Mr. Walker was the only person who could have contradicted Ms. Walker's identification of Defendant leaving the scene of the Pilcher homicide. Mr. Walker would have been likely to do so, argues Defendant, because notations of his two (2) interviews by Oklahoma City Police contain no references to seeing Defendant at the scene of the crime, or to his wife, Ms. Walker, in any capacity.[4]

This theory is flawed. As the Government points out, the Government was not required to disclose the identity of Ms. Walker as a Government witness under 18 U.S.C. § 3432 until October 21, 2005. That means that the Government could have submitted notice of Ms. Walker to Defendant in full compliance with § 3432 at a time when Mr. Walker would nonetheless have been deceased. The Government argues that this fact demonstrates that Mr. Walker's death is not "prejudice assignable to disclosure of Mary Walker as a witness on October 31st rather than October 21st, 2005." (Doc. No. 3322 at 2). Defendant responds that the Government's hypothetical scenario is sophistry, and that the critical facts are these: the Government was not reasonably diligent in discovering the testimony of Ms. Walker, and as a result, Mr. Walker was dead, to the irreparable prejudice of Defendant, at the time Ms. Walker's testimony was uncovered.

In the first place, Defendant's argument fails on its own terms because the Court has now

---

[4]  Because the Court resolves this matter on other grounds, the Court does not address the dispute between the parties as to whether or not Defendant's stipulation of Mr. Walker's likely testimony is so speculative as to defeat Defendant's prejudice argument.

found that the Government's investigation leading to discovery of Ms. Walker's testimony was reasonably diligent. However, Defendant's argument is also conceptually flawed: the death of Mr. Walker is unrelated to the timing of the Government's disclosure of Ms. Walker as a witness. If Mr. Walker had died on October 22, 2005 – one day after the § 3432 deadline –, this Court would still find no prejudice in Mr. Walker's passing, because Mr. Walker's passing would not, in that scenario, be the result the Government's violation of § 3432. The Court would be persuaded to consider the death of Mr. Walker as constituting irreparable prejudice in this case only upon a showing that the Government, for example, was aware that Mr. Walker was ill, and delayed disclosure of Ms. Walker to Defendant until Mr. Walker had actually passed. As mentioned before, however, there has been no showing of bad faith on the part of the Government. For this reason, the Court finds that Mr. Walker's death does not constitute irreparable prejudice warranting exclusion of Ms. Walker's testimony.

### B. The Deterioration of Ms. Walker's Memory

Defendant also argues that the period of time between Ms. Walker's alleged eyewitness identification of Defendant and her later identifications to the Government in 2005 and, potentially, at trial, have resulted in prejudicial deterioration of Ms. Walker's memory. Defendant characterizes Ms. Walker's memory loss as both the result of natural processes and a product of Ms. Walker's self-described intentional forgetting. (Doc. No. 3418 at 4-5).

Defendant's arguments under this theory go to the reliability of Ms. Walker's testimony, a matter more properly discussed in response to Defendant's argument for exclusion under the Due Process Clause of the Fourteenth Amendment. The Court fails to see how the Government's disclosure of witness Ms. Walker 10 days after the § 3432 can be colored as the cause of

-18-

prejudicial deterioration in Ms. Walker's recollection of events on the day of the Pilcher murder.

Accordingly, the Court finds that no irreparable prejudice will result from admission of Ms. Walker's testimony though the Government provided disclosure of said testimony 10 days late. This means that, under the Court's analysis, none of the three (3) factors enumerated by the Sixth Circuit weigh in favor of exclusion of Ms. Walker's testimony. This matter has resulted in a two (2) year delay of this case, during which time the Defendant has had ample time to prepare its defense in light of Ms. Walker's prospective testimony. The Court therefore concludes that no further delay is necessary to remedy the Government's violation of § 3432 with respect to Ms. Walker, and that Ms. Walker's testimony is admissible under § 3432 at the trial scheduled to resume jury selection on January 5, 2009.

### (ii)    Federal Rule of Evidence 403

Defendant argues that Ms. Walker's testimony should be excluded under Rule 403 of the Federal Rules of Evidence. Rule 403 states that:

> [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED. R. EVID. R. 403.

The Court is not aware of any federal case in which an eyewitness identification of the defendant was excluded under Rule 403, and Defendant cites to none. On the contrary, there is binding authority for the proposition that an eyewitness identification of the defendant may be

-19-

excluded only under the rule established in Neil v. Biggers, 409 U.S. 188 (1992). See Howard v. Bouchard, 405 F.3d 459, 469 (6th Cir. 2005); United States v. Beverly, 369 F.3d 516, 538-39 (6th Cir. 2004); United States v. Hill, 967 F.2d 226, 230 (6th Cir. 1992) (summarizing the Biggers rule, "[t]he Supreme Court has prescribed a two-step analysis for determining the admissibility of identification evidence"). Accordingly, Defendant's request for exclusion of Ms. Walker's testimony under Rule 403 is denied and the Court considers the admissibility of said testimony under Biggers in the section below.

### (iii)    Due Process

Due process requires exclusion of eyewitness identification evidence where each of two (2) conditions is present: (1) the Defendant is able to establish that the identification procedure was impermissively suggestive, and (2) under the totality of the circumstances, the identification was nonetheless not reliable. Manson v. Brathwaite, 432 U.S. 98, 114 (1977); Biggers, 409 U.S. at 198; United States v. Crozier, 259 F.3d 503, 510 (6th Cir. 2001); Hill, 976 F.2d at 230. Because the identification procedure employed in this case was not impermissively suggestive, the Court finds that exclusion of Ms. Walker's testimony is improper without analyzing the reliability of Ms. Walker's identification. See United States v. Meyer, 359 F.3d 820, 824 (6th Cir. 2004); Hill, 976 F.2d at 230. A determination of reliability is properly left to the jury in this case. See United States v. Smith, 148 Fed. Appx. 867, 872 (11th Cir. 2005) ("evaluation of an eyewitness's testimony is precisely the kind of analysis that is reserved for the jury").

### 1.    The Suggestiveness of the Identification Procedures

The case law does not provide an all-purpose standard for determining what identification

Case 3:98-cr-00038   Document 3464   Filed 01/13/09   Page 20 of 25 PageID #: 20882

procedures are unduly suggestive. However, on the facts of this case, <u>United States v. Beverly</u> is directly on point. 369 F.3d 516 (6th Cir. 2004). In <u>Beverly</u>, an FBI Agent traveled to the home of Mrs. Parks, the defendant's wife, and informed her that her husband had been arrested in connection with several bank robberies that occurred four (4) years prior. <u>Id.</u> at 538. The Agent then produced a single photograph of the defendant from the time of the robberies and asked "do you recognize that person there?" <u>Id.</u> The Sixth Circuit found that the identification procedure in <u>Beverly</u> was not suggestive for three (3) reasons: (1) Mrs. Parks was very familiar with the defendant, (2) in presenting the photograph, the Agent did not ask "is this your husband?", and (3) Mrs. Parks, as the defendant's wife, was unlikely to be biased against the defendant "and would have [had] every reason not to identify . . . [the defendant] to the authorities, if there was any doubt." <u>Id.</u>

Each of the three (3) reasons that informed the <u>Beverly</u> decision applies in the present case. First, Ms. Walker was very familiar with the Defendant. Ms. Walker cleaned an apartment that was frequented by Defendant for approximately a year and a half prior to her alleged viewing of Defendant leaving the scene of the Pilcher murder. Ms. Walker testified that she saw Defendant often during this time, and that she and Defendant were acquaintances. Clearly, Ms. Walker did not have the degree of familiarity and contact with Defendant that Mrs. Parker likely had with her husband in <u>Beverly</u>, but the Court finds this distinction to be immaterial. What matters for purposes of determining the suggestiveness of the identification procedure is that Defendant was not unknown to Ms. Walker, but rather was a person "she knew very well and would readily recognize." <u>Id.</u>

Second, according to the testimony of Ms. Walker and Detective Leiker, the Government

-21-

asked Ms. Walker if she recognized anyone from the 30 photographs shown to Ms. Walker. As in <u>Beverly</u>, the Government did not point to a photograph and ask whether it was Defendant. Moreover, the procedure used here was even less suggestive than in <u>Beverly</u> because the Government showed Ms. Walker 30 photographs as opposed to just one, and Ms. Walker was familiar with several of the individuals depicted.

Third, Ms. Walker testified that she did not want to be involved with any Government investigation or prosecution. She testified that it was partially for this reason that she never sought out police to give her account of the day of Pilcher's killing, and that, once discovered, she did not volunteer anything but instead provided information only in response to pointed questioning. While this testimony does not place Ms. Walker on a par with Mrs. Parks in <u>Beverly</u> in terms of her likely opposition to prosecution of Defendant, <u>id.</u> at 538, it does establish that Ms. Walker, like Mrs. Parks, was a reluctant Government witness. Under these circumstances, it is appropriate to infer, as in <u>Beverly</u>, that Ms. Walker would not have made any identification if she were in doubt. <u>Id.</u>

Defendant argues that the identification procedure used in this case was nevertheless impermissively suggestive for three (3) reasons: (1) the Government did not record or completely transcribe the identification process, making the degree of suggestion by the Government unknown; (2) the Government showed Ms. Walker 16-packs, rather than a 6-pack; and (3) Defendant was the only individual depicted in the 16-packs wearing glasses.

Defendant has presented no case law in support of his three (3) arguments, and the Court finds none directly on point. Instead, Defendant cites to procedural manuals from the Los Angeles Police Department and the Department of Justice to suggest that the failure to more

-22-

comprehensively transcribe Ms. Walker's identification and the use of 16-packs were contrary to State and federal policy. The Court notes that this information is probative and perhaps of significant weight in the ordinary run of witness identifications, but ultimately finds it unpersuasive in light of the facts noted above and the authority of <u>Beverly</u>.

First, that the Government did not record or comprehensively transcribe the identification procedure in this case is no evidence that the identification procedure was in fact suggestive. The Court is aware of no precedent for the proposition that, in the absence of detailed notes or a recording of an identification procedure, a defendant is entitled to a presumption of suggestiveness. Accordingly, Defendant's argument that impermissive suggestion may have occurred is speculation upon which this Court cannot base a decision.

Second, the use of 16-packs is unproblematic in this case because Ms. Walker was familiar with Defendant's appearance, and because the Government asked her generally if she recognized anyone. The Court notes that 6-packs are less suggestive than 16-packs because the individuals chosen for a 6-pack share physical features in common, whereas 16-packs are usually internal government reference materials that contain photographs of known members of a gang. However, the greater protection afforded by 6-packs is unnecessary where the witness, in this case, Ms. Walker, was familiar with Defendant's appearance. Mrs. Parks in <u>Beverly</u> was given only a single photograph - certainly a more suggestive procedure than the use of 16-packs – and the fact of her prior familiarity with the defendant nonetheless made the procedure not suggestive. Moreover, as discussed above, Ms. Walker was asked who she recognized, not if a given individual was Defendant, in precisely the manner sanctioned by the Sixth Circuit in <u>Beverly</u>, and she identified five (5) individuals, of whom Defendant was one (1). For these

-23-

reasons, the use of 16-packs standing alone did not result in impermissible suggestion in this case.

Third, for similar reasons, the procedure used was not suggestive although Defendant was the only individual wearing glasses in the photographs shown to Ms. Walker. Ms. Walker was familiar with Defendant's appearance prior to being shown Defendant's image in a 16-pack, and there is no evidence that the Government steered Ms. Walker towards identifying Defendant as the individual depicted wearing glasses or otherwise emphasized that he wore glasses. In fact, the testimony before the Court was that Ms. Walker identified the Defendant as wearing glasses after identifying Defendant from a photograph.

Because Defendant's arguments are not persuasive given the facts of this case, and because Beverly is directly on point, the Court finds that the identification procedure used by the Government was not suggestive.

### 2. Reliability Not Addressed

Since there was no improper suggestion in this case with regard to Ms. Walker's identification of Defendant, the Court is able to reach a decision without considering the reliability of Ms. Walker's identification: there is no due process violation in permitting Ms. Walker's testimony and prospective in-court identification to go before a jury.

## IV. CONCLUSION

Because the Court finds that no prejudice will result to Defendant as a result of the Government's violation of 18 U.S.C. § 3432, and because Ms. Walker's identification of Defendant to the Government and prospective in-court identification were not the result of

-24-

suggestive identification procedures, this Court finds evidence related to Ms. Walker's testimony to be **ADMISSIBLE**. Defendant's Motion is therefore **DENIED**.

It is so ORDERED.

Entered this ___5___ day of ___January___, ___2009___.


_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Case 3:98-cr-00038   Document 3464   Filed 01/13/09   Page 25 of 25 PageID #: 20887